Joseph F. WILKINSON, Plaintiff,

v.

YAMASHITA–SHINNIHON KISEN, K.K., Defendant.

Joseph F. WILKINSON, Plaintiff,

v.

D/S A/S DEN NORSKA AFRIKA–OG, etc., Defendant.

Civ. A. Nos. 71–106–M, 71–1090–M.

United States District Court, D. Maryland.

Oct. 25, 1973.

As Corrected Nov. 27, 1973.

Joseph F. Lentz, Jr., Baltimore, Md., for plaintiff Wilkinson.

Donald L. Merriman, Baltimore, Md., for defendant Yamashita-Shinnihon Kisen, K.K.

**112**

Eugene A. Edgett, Jr., Baltimore, Md., for defendant D/S A/S DEN NORSKA AFRIKA-OG, etc.

JAMES R. MILLER, Jr., District Judge.

## MEMORANDUM

These two cases were consolidated for trial on the issue of damages. Previously separate trials were held on the issue of liability. Although the pretrial preparation of these cases by counsel did not adequately inform the court of the issues which would be presented at the trial, the cases have presented interesting and unusual questions of law.

In a previous oral opinion in Civil Action No. 71-106-M, the court has found that Joseph F. Wilkinson, a longshoreman then employed by Baltimore Stevedoring Company, Inc., was injured on November 1, 1970, as a proximate result of the negligence of the defendant Yamashita-Shinnihon Kisen, K.K. on its ship, SS YAMAWAKA MARU. The plaintiff's negligence contributed to this accident to the extent of 50% when he slipped on ice in a reefer on the SS YAMAWAKA MARU, thereby falling and injuring his back. The court, therefore, has previously determined that the defendant, Yamashita-Shinnihon Kisen, K.K., is liable to the plaintiff for 50% of the injuries to the plaintiff proximately caused by the negligence of the defendant.

In an oral opinion previously rendered in Civil Action No. 71-1090-M, the court has found that the defendant's ship, SS TITANIA, was unseaworthy in the manner in which access was provided from the deck to No. 1 hatch on the forecastle. Undisputed testimony established that the hatch coaming was 57 inches high and that the only rung or step on the port side of the outside wall of the hatch coaming was 17 inches above the deck. The court has found that no other means was provided for the plaintiff, a longshoreman then employed by ITO Corporation of Baltimore, Inc., to climb over the hatch coaming to descend into the hatch for the purpose of discharging cargo on May 25, 1971. On that date, the plaintiff injured his right knee while attempting to climb the hatch coaming of No. 1 hatch on the SS TITANIA. Although finding that the SS TITANIA was unseaworthy and that the unseaworthiness was a proximate cause of the plaintiff's injury to his knee, the court in the previous liability trial reserved judgment on the issue of the plaintiff's contributory negligence.

When the evidence had been completed on the issues of liability and damages in these two cases, it was apparent that the plaintiff was claiming that his physical condition caused by the first accident contributed to the occurrence of the second accident and that, in addition, the second accident aggravated the preexisting back injury resulting from the first accident. The court has attempted to unravel the legal tangle which has thereby resulted.

From the credible evidence, the court finds as a fact that the plaintiff's average weekly wage was $127 at the time of his injury to his back on November 1, 1970; that he was off from work from November 1, 1970, through April 18, 1971, as a result of that injury; and that he received a lumbo-sacral strain with sacroiliac involvement from that accident. His back injury was very painful, required him to wear a back brace, and limited his ability to climb ladders and to lift groceries from grocery carts when he was shopping. Although the plaintiff's back gradually improved after the accident, it was not asymptomatic on May 25, 1971.

As a matter of fact, plaintiff testified that his back on May 25, 1971, was very painful; that as of that time he was afraid to climb ladders at home due to his difficulty in lifting one foot over the other because of the back injury and that he still could not lift groceries out of grocery carts. Furthermore, he said

that he had difficulty standing on his right leg.

On May 25, 1971, while standing on the rung on the outside port wall of the No. 1 hatch coaming of the SS TITANIA, the plaintiff, in an attempt to straddle the top of the hatch coaming, lifted his right leg to throw it over the top of the coaming but, in doing so, he was unable to lift his right knee high enough. It struck the edge of the hatch coaming. The plaintiff's back condition contributed to his being unable to get his right leg high enough to enable him to climb onto the coaming without hitting his knee.

The trauma to his right knee on the SS TITANIA resulted in a contusion and swelling of the right knee, without fracture or dislocation. From the credible medical evidence, the court finds that the trauma to the right knee caused chrondromalacia or degeneration of the cartilage on the back of the patella (knee cap), a condition discovered in an exploratory operation performed in December, 1971.

The injury to the knee resulted in swelling and pain in the right knee which in turn caused the plaintiff to limp. This limp, alleviated by the use of crutches initially and then a cane, aggravated the preexisting back injury. If it had not been for the knee injury which resulted in an altered gait, the plaintiff's back would have eventually improved to the point at which he could have performed his regular duties associated with the work of a longshoreman. While he would have had a permanent anatomical loss of 10% of his back as a direct result of the fall of November 1, 1970, that anatomical loss, although somewhat painful and inconvenient, would not have had a sufficiently disabling effect, in and of itself, to prevent the plaintiff from continuing work as a longshoreman.

The plaintiff has been off from work from May 26, 1971, through the close of evidence in this case (September 14, 1973) with the exception of one or two days in the spring of 1972.

The plaintiff, now 50 years of age, with a life expectancy of 23 years, testified that his back and knee prevent him from working at all. He says that his back and knee prevent him from engaging in certain recreational activities which he used to enjoy, such as dancing, crabbing, and walking, and that he cannot stoop, lift, nor go up and down ladders. He further states that his buttocks ache if he sits or stands for too long a period. He complains also that his sexual relations have been severely hindered by his physical condition and that he is no longer able to perform any of the work around the house or the yard which he used to do.

From all of the credible evidence, the court finds as a fact that the plaintiff has an anatomical loss equivalent to a 30% permanent disability of his right knee. The court further finds that the plaintiff also has an anatomical loss equivalent to a 20% permanent disability of his back of which 10% permanent disability occurred as a direct result of the fall on November 1, 1970, and of which the remaining 10% is an aggravation caused as a direct result of the altered gait produced by the knee injury of May 25, 1971. The plaintiff reached his maximum stage of improvement on October 31, 1972, and has not seen any physicians for treatment nor obtained any prescriptions for medication in reference to his back or knee since that time.

All of the medical evidence in these cases supports the conclusion that the plaintiff is no longer physically able to perform the work of a longshoreman in the hold of a ship. He must avoid extreme changes in temperatures, lifting, climbing, and uneven surfaces.

There was some evidence that the plaintiff is completely unemployable and that he cannot be vocationally rehabilitated. The court does not find that evidence convincing. There is substantial

evidence in this case that part of the plaintiff's difficulties is the result of his emotional reaction to his organic physical disabilities. To the extent that the plaintiff has a functional overlay on his permanent organic disabilities, the court believes that it was caused equally by the November 1, 1970, accident and the May 25, 1971, accident. No expert medical evidence is necessary for the court to reach that conclusion. Sentilles v. Inter-Caribbean, 361 U.S. 107, 109, 80 S. Ct. 173, 4 L.Ed.2d 142 (1959). This is not to say, however, that the court believes that the plaintiff has met his burden of proof in these consolidated cases to establish that he is completely unable to work in any capacity on the waterfront or elsewhere. From all of the credible evidence, the court finds as a fact that the plaintiff could work in a relatively sedentary job, if he had the proper motivation so to do, and earn at least one-half of the average wage that he would have earned had he continued to work as a longshoreman on the waterfront.

Plaintiff came to work on the Baltimore waterfront in the ILA contract year of 1962–63. For the seven ensuing full contract years before the year in which the plaintiff fell on the YAMAWAKA MARU, he averaged 800 hours of work. He eventually became a regular member of a longshoring gang and was 15th man on the gang at the time of his injury in November, 1970. The court concludes as a fact that the plaintiff, but for the injuries sustained in November, 1970, and May, 1971, would have continued to work as a longshoreman on the waterfront, working at least 800 hours per contract year until he reached the age of 65, the age at which it is generally recognized in this District that working life on the waterfront ends. The plaintiff would, therefore, have qualified for the following benefits under the collective bargaining agreement between his union and the Steamship Trade Association of Baltimore:

(1) Pension at age 65 of $250 per month for life.

(2) Term life insurance of $6,000 up to age 65 of which $1,000 would be paid up at age 65.

(3) Major medical expense policy with limits of $10,000.

(4) Guaranteed minimum number of hours as basis of straight-time wage equal to 1900 hours annually.

These benefits are presently contained in a contract that will expire in a relatively short time; the history of collective bargaining, however, justifies the court in concluding that future contracts will be at least as liberal in benefits to longshoremen as is the present contract.

An insurance expert testified solely in Civil Action No. 71–106–M that the annual cost to a person at age 50 of an annuity policy providing the same benefits as the above pension would be $1,817, that the annual cost of a like life insurance policy would be $170.81, and that the annual cost of a like major medical policy would be $125. The court so concludes as a fact in Civil Action No. 71–106–M only.

The court finds as a fact that the present straight-time wage rate for longshoremen in the port of Baltimore under the existing contract is the sum of $5.55 per hour.

The plaintiff has testified that his physical condition on May 25, 1971, as he went to work was so bad that he could not do any of his household work, he could not climb up and down ladders at home, and that he could not even lift groceries out of a grocery cart. Even allowing for some exaggeration by the plaintiff, his continuing to work under those circumstances, and particularly his attempting to climb over what he described as the highest coaming he had ever seen, created an unreasonable risk of injury to himself. The plaintiff should have informed his employer of his condition and should not have attempted to climb the coaming in the manner in which he did. Mroz v. Dravo Corp., 429 F.2d 1156 (3rd Cir. 1970); DuBose v. Matson Navigation Co., 403

F.2d 875 (9th Cir. 1968); Curry v. United States, 327 F.Supp. 155 (N.D. Cal.1971).

■ In Civil Action No. 71–1090–M, there was some argument on the basis of additional evidence adduced in that case that the plaintiff was contributorily negligent for failure to await a ladder. The evidence in that case, however, did not demonstrate that there was a ladder readily available. It is true that six or seven hours later there was a ladder on the port side of the coaming, but the evidence did not show how the ladder got there or where it came from. The court concludes as a matter of fact and law that the plaintiff was not contributorily negligent for failing to await the ladder.

From the evidence adduced individually in Civil Action No. 71–106–M and in Civil Action No. 71–1090–M, the court, therefore, concludes as a matter of fact and law in both cases that the plaintiff's negligence on that date contributed to the extent of 50% to the accident which he sustained on May 25, 1971, and that his contributory negligence was a proximate cause of that accident and the injuries resulting therefrom.

From what has been said, it is apparent that there were at least three causes of the accident of May 25, 1971. One cause was the unseaworthiness of the SS TITANIA in its coaming design on the No. 1 hatch. This would normally make the defendant liable to plaintiff in Civil Action No. 71–1090–M. Another cause was the original negligence of Yamashita-Shinnihon Kisen, KK in its housekeeping of the reefer on the SS YAMAWAKA MARU which resulted in the plaintiff's back injury on November 1, 1970, and which in turn contributed to the plaintiff's inability to lift his right leg over the coaming to avoid striking his knee on the SS TITANIA on May 25, 1971. This normally would be sufficient to make the defendant liable to the plaintiff in Civil Action No. 71–106–M for the injuries sustained by him as a result of the May 25, 1971 accident. Am-

mar v. American Export Lines, Inc., 326 F.2d 955 (2d Cir. 1964); Green v. Orion Shipping and Trading Co., 139 F. Supp. 431 (D.Md.1956). A third cause of the accident of May 25, 1971, was the contributory negligence of the plaintiff. This would normally reduce the damages which the plaintiff would otherwise be entitled to recover against either defendant for the injuries resulting from the accident of May 25, 1971. Socony-Vacuum Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939); Hudgins v. Gregory, 219 F.2d 255 (4th Cir. 1955).

■■ The difficulty in these cases flows from the fact that the accident of May 25, 1971, resulted in part from the negligence of Yamashita-Shinnihon Kisen, KK, but that it also resulted in part from the unseaworthiness of the SS TITANIA. There is no right of contribution under maritime law in non-collision cases as between joint tortfeasors or mutual wrongdoers. Halcyon Lines v. Haenn Ship Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952); Atlantic Coast Line Railroad Co. v. Erie Lackawanna Railroad Co., et al., 406 U.S. 340, 92 S.Ct. 1550, 32 L.Ed.2d 110 (1972). Therefore, each defendant in these two cases could theoretically be liable for the entire consequences of the accident of May 25, 1971, less, of course, a 50% reduction of damages due to the plaintiff's contributory negligence on that date. If the court had tried Civil Action No. 71–106–M first, it could have awarded in that case against Yamashita-Shinnihon Kisen, KK damages to the plaintiff for all of the results of the accident of November 1, 1970, as well as of the accident of May 25, 1971, after making appropriate reductions for the plaintiff's contributory negligence. Ammar v. American Export Lines, Inc., *supra*. If the court had tried Civil Action No. 71–1090–M first, on the other hand, it could have awarded against the defendant in that case to the plaintiff all of the damages which he sustained as a result of the accident of May 25, 1971, after an appropriate deduction for the plaintiff's

contributory negligence. But the court normally could not award to the plaintiff in both cases the damages which he sustained as a result of the accident of May 25, 1971, because to do so would compensate plaintiff twice for the same injury. Such a result would violate basic precepts of American jurisprudence. See Crooks v. United States, 459 F.2d 631, 633–634 (9th Cir. 1972); Brightheart v. McKay, 136 U.S.App.D.C. 400, 420 F.2d 242 (1969); Bartholomew v. Universe Tankships, Inc., 279 F.2d 911 (2d Cir. 1960); McCarthy v. American Eastern Corp., 175 F.2d 727, 729 (3rd Cir. 1949), cert. denied, 338 U.S. 911, 70 S.Ct. 349, 94 L.Ed. 561 (1950); Pavlakis v. Seacrest Shipping Co., 136 F.Supp. 553 (D.Md.1955).

In the present situation, the two defendants, which are each liable separately for all of the damages resulting from the accident of May 25, 1971, have been sued in separate suits, but the two suits have been consolidated and tried together for the purposes of determination and assessment of damages. Since the court cannot award the plaintiff all of his damages resulting from the second accident in both cases, there is a potential question as to which case is the one in which the damages from the May, 1971, accident should be assessed.

In Civil Action No. 71–106–M, the older of the cases and the one in which Yamashita-Shinnihon Kisen, KK is the defendant, all damages proximately resulting from the accident of May 25, 1971, must be reduced by 50% as a result of the plaintiff's contributory negligence on that date, but must also be reduced by an additional 50% as a result of the plaintiff's contributory negligence on November 1, 1970. Ammar v. American Export Lines, Inc., *supra*. If the plaintiff were awarded in Civil Action No. 71–1090–M, however, his full damages proximately resulting from the May 25, 1971, accident, the damages would be reduced only by the 50% of the plaintiff's negligence contributing to that accident. In other words, an award in Civil Action No. 71–106–M to the plaintiff for his damages proximately resulting from the accident of May 25, 1971, still leaves him unreimbursed for 50% of those damages after giving credit for his contributory negligence of May 25, 1971. To that extent, plaintiff is entitled to recover against defendant in Civil Action No. 71–1090–M. The court believes that this method of apportionment of the damages in the two cases is not only a legally correct one but also a practical and equitable one.

■■ The plaintiff is entitled to recover as damages compensation for pain and suffering, wages lost, medical expenses, impairment of future earning capacity, and impairment of his body. Downie v. United States Lines Co., 359 F.2d 344, 347 (3rd Cir. 1966), cert. denied, 385 U.S. 897, 87 S.Ct. 201, 17 L. Ed.2d 130 (1966); Lowe v. Vessel Madrid, 210 F.Supp. 826, 830 (S.D.Fla. 1962). He is furthermore entitled to recover the economic fringe benefits of his working as a longshoreman to the extent that he has lost them as a result of the injury. Since the testimony of the insurance expert was not admitted into evidence in Civil Action No. 71–1090–M, the computation of damages in that case will not make any allowance for the claimed damages which were the subject of his testimony.

■■ In determining the wages which have been lost, the court has taken into consideration the fact that the defendant would have qualified for the minimum guaranteed hours (euphemistically known as guaranteed wage) allowed by the union contract and has, therefore, on the basis of a wage rate of $5.55 per hour calculated his potential earnings as a longshoreman, were it not for the accidents complained of herein, to be the sum of $10,545 annually. In awarding damages for future loss of wages, the court must discount the future lost wages to their present value to

take into consideration the fact that a present cash sum will earn interest to produce monies in the future for which compensation is allowed. Waterman Steamship Corporation v. Rodriguez, 290 F.2d 175, 180 (1st Cir. 1961); Green v. Orion Shipping and Trading Co., *supra*, 139 F.Supp. at 439. Since the court has allowed the plaintiff the benefit of present economic conditions in comput-ing his future losses, it is appropriate to recognize the fact of present high inter-est rates and use 5% as the discount rate for computing the present value of future losses.

A computation of the award of dam-ages in accordance with the principles set forth in this memorandum opinion follows:

---

Civil Action No. 71–106–M

Accident #1—11/1/70

Lost Wages

| 11/1/70 through 4/18/71 24 weeks at $127 = | $ 3,048.00 |
|---|---|

Medical Expenses

| Stipulated at | $ 558.27 |
|---|---|

Pain and Suffering

| Past and future | $10,000.00 |
|---|---|

Permanent Injury

| Permanent disability of 10% of back | $15,000.00 |
|---|---|

Accident #2—5/25/71

Lost Wages

| 5/26/71 through 10/31/72 75 weeks at $127 = | $ 9,525.00 |
|---|---|
| 10/31/72 through 9/14/73 45 weeks at $\frac{$127}{2}$ = | $ 2,857.50 |

Medical Expenses

| Stipulated at | $ 1,686.25 |
|---|---|

Pain and Suffering

| Past and future | $ 15,000.00 |
|---|---|

Permanent Injury

| Permanent disability of 30% of right knee | $ 15,000.00 |
|---|---|
| Aggravation of preexisting back disability by 10% | $ 15,000.00 |

Future Loss of Wages (Present Value)

| $\frac{$10,545}{2}$ x 15 discounted at 5% = | $ 54,728.55 |
|---|---|

Present Value of Lost Pension and Insurance Benefits

| $2,112.81 x 15 discounted at 5% | $ 21,930.97 |
|---|---|

| | | |
|---|---|---|
| Total Accident #2 = | $135,728.27 | |
| less 50% for con-tributory negligence of 5/25/71 | −67,864.14 | |
| | | $ 67,864.13 |
| Total Damages | | $ 96,470.40 |
| less 50% for con-tributory negligence of 11/1/70 | | |
| | | −48,235.20 |
| Total Damages Assessed in C.A. 71–106–M | | $ 48,235.20 |

Civil Action No. 71–1090–M

Accident #2—5/25/71

Lost Wages

| 5/26/71 through 10/31/72 75 weeks at $127 | $ 9,525.00 |
|---|---|
| 10/31/72 through 9/14/73 45 weeks at $\frac{$127}{2}$ = | $ 2,857.50 |

Medical Expenses

| Stipulated at | $ 1,686.25 |
|---|---|

Pain and Suffering

| Past and future | $ 15,000.00 |
|---|---|

Permanent Injury

| Permanent disability of 30% of right knee | $ 15,000 00 |
|---|---|
| Aggravation of preexisting permanent back disability by 10% | $ 15,000.00 |

Future Loss of Wages (Present Value)

| $\frac{$10,545}{2}$ x 15 discounted at 5% | $ 54,728.55 |
|---|---|

| | |
|---|---|
| Total Damages | $113,797.30 |
| less 50% for contributory negligence of 5/25/71 | −56,898.65 |
| | $ 56,898.65 |
| less 50% thereof recovered in C.A. 71–106–M | 28,449.32 |
| Total Damages Assessed in C.A. 71–1090–M = | $ 28,449.33 |

---

For the reasons set forth herein, a judgment will be entered in favor of the plaintiff against the defendant in Civil Action No. 71–106–M in the sum of $48,235.20, and a judgment will be en-tered in favor of the plaintiff against the defendant in Civil Action No. 71–1090–M in the sum of $28,449.33, plus costs.

This opinion shall constitute the court's findings of fact and conclusions of law even though not expressly so des-ignated.